**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**TERENCE BYRON MOOD and
TERENCE BYRON MOOD IRA**

**PLAINTIFFS
(Class Representatives)**

**V.**                                    CASE NO. 3:25-cv-768-KHJ-MTP

**CLASS COMPLAINT
28 U.S.C. § 1332(d)**

**COMMUNITY BANK OF MISSISSIPPI;
DAVID F. ROWE;
SCOTT W. WADMAN; and
JOHN DOES 1-25**                              **DEFENDANTS**

**CLASS ACTION COMPLAINT
(Jury Trial Demanded)**

Plaintiffs/Class Representatives, Terence Byron Mood and the Terence Byron Mood IRA, through counsel and pursuant to 28 U.S.C. § 1332(d) and Federal Rule of Civil Procedure 23, file this Class Action Complaint against Defendants Community Bank of Mississippi ("Community Bank"); David F. Rowe; Scott W. Wadman; and John Does 1-25 (collectively, "Defendants"), and in support thereof, allege the following:

**Nature of Action**

This case arises from a large-scale investment fraud. Beginning in or about 2021, David F. Rowe and Scott W. Wadman orchestrated a scheme to defraud more than 100 investors out of $9,000,000 by selling investments in Integrated Medical and Wellness Clinic of Mississippi LLC ("Integrated Medical"). They recruited William "Danny" Chancellor, who held himself out to be a financial advisor, to help sell the investments. Together, Rowe, Wadman, and Chancellor promoted Integrated Medical as a new venture for the purpose of building walk-in medical clinics in Mississippi

- 1 -

and Texas. They promised investors high interest returns with a guaranteed return of principal. Most of the investors, like Plaintiffs, were elderly, and they relied on those representations that their investments would be secure.

The investors, including Plaintiffs, only received interest payments on their investments for a short time, then the payments stopped altogether. A string of excuses from Rowe and Chancellor followed, but there was no explanation for what happened to the $9,000,000 of investors' money.

In reality, Integrated Medical was a sham; it had never been registered or notice-filed as an investment offering with the Mississippi Secretary of State's Office. Moreover, neither Rowe, Wadman, nor Chancellor, were licensed and registered to sell the investments. And sadly, there was never any effort undertaken to build new medical clinics. Upon information and belief, the limited interest payments to investors were funded with investment monies received from subsequent investors, thus, Rowe and Wadman operated Integrated Medical as a Ponzi scheme and then, apparently, they pocketed the remaining funds.

This fraud was perpetrated across a network of bank accounts that Rowe maintained at Community Bank of Mississippi. Plaintiffs are informed and believe, and thereon allege, that Community Bank permitted Rowe to perpetrate this fraud by failing to conduct even the most basic and minimal due diligence and exercise of "Know Your Customer" standards. Had Community Bank exercised proper due diligence, it would have discovered that Rowe had perpetrated a $28,000,000 bank fraud scam in Canada and the Western United States for which he had pled guilty to wire fraud in 2007. Additionally, Community Bank would have discovered that Rowe had filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Mississippi relative to his previous bank fraud activities and for which he claimed $33,000,000 in debts. Community Bank also would have discovered that this district's Bankruptcy Court entered a default judgment against Rowe for $53,000,000 as a result of his fraudulent activities. And finally, Community Bank would have

discovered that three years after his conviction, Rowe sought bankruptcy protection in this judicial district a second time.

As alleged more particularly herein, because Community Bank failed to observe the reasonable commercial standards for which it was duty-bound to meet, Rowe, a repeat bad actor, was allowed to perpetrate this fraud and fleece the investors out of millions of dollars. Accordingly, Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons who invested in Integrated Medical and Wellness Clinic of Mississippi, LLC from at least as early as May 1, 2021 until January 1, 2024.

## Parties

1.      Plaintiff, Terence Byron ("Terry") Mood, is an adult resident citizen of Lafayette County, Mississippi. Plaintiff brings this action by and through his attorney-in-fact, Jeannie Campbell, his natural daughter, who is a citizen of Oregon.

2.      Plaintiff, Terence Byron Mood IRA, is a traditional individual retirement account held for the benefit of Terence Byron Mood through its custodian, Digital Trust, an online platform with its principal place of business in California. Plaintiff brings this action by and through Jeannie Campbell, natural daughter and the attorney-in-fact for the IRA beneficiary Terence Byron Mood.

3.      Defendant Community Bank of Mississippi ("Community Bank") is a corporation organized under the laws of Mississippi with its principal place of business located at 1905 Community Bank Way, Flowood, Mississippi 39232. Community Bank may be served with process of this Court at that address upon any director, officer, or employee authorized to accept service.

4.      Defendant, David F. Rowe ("Rowe"), is upon information and belief, a resident of the State of Texas. He may be served with process of this Court at 3281 Rocky Creek Road, Suite 200, Missouri City, Texas 77459.

5.     Defendant, Scott W. Wadman ("Wadman"), is upon information and belief, a resident of the State of Florida. He may be served with process of this Court at 8249 Preserve Point Drive, Ft. Myers, Florida 33912.

6.     Defendants Johns Does 1-25 are Defendants whose identities are not yet known but who may become known through discovery.

## Jurisdiction and Venue

7.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are at least 100 class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendants because: (i) Community Bank is a citizen of Mississippi; and/or (ii) the claims arise from Defendants' contacts with Mississippi, the forum state.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## Class Action Allegations

10.     Plaintiffs incorporate by reference all prior allegations as if set forth herein.

11.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Federal Rule of Civil Procedure 23, on behalf of the following Class:

> All investors: (i) who were sold unregistered securities, in the form of promissory notes, by William Danny Chancellor and/or another seller, as an investment in Integrated Medical and Wellness Clinic of Mississippi, LLC; (ii) whose investment proceeds and/or interest payments flowed into or out of bank accounts controlled by David F. Rowe (a/k/a Dave Rowe) at Community Bank; and (iii) who lost money as a result of the fraudulent scheme conducted through and facilitated by Community Bank.

12.     Excluded from the Class are directors, officers, employees, or agents of any Defendant; and the judicial officers, and their immediate family members, and the Court's staff assigned to this Class Action. Plaintiffs reserve the right to modify or amend the Class definitions, if and as appropriate, during this Class Action.

13.     Certification of Plaintiffs' claims for class treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

14.     This Class Action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

## Numerosity: Fed. R. Civ. P. 23(a)(1)

15.     The members of the Class are so numerous and geographically dispersed that individual joinder of all members is impracticable. Plaintiffs are informed and believe that there are at least 100 members of the Class, as already determined by the Mississippi Secretary of State's Securities Division. *See* Order to Cease and Desist, Admin. Order No. S-24-7090, *9 (Jun. 18, 2025), attached as **Exhibit 1**. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

## Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)

16.     This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

(i)     Whether Defendants, or any of them, engaged in the conduct alleged herein;

(ii)    Whether Defendants, or any of them, sold unregistered securities to Class Members;

(iii)    Whether Defendants, or any of them, engaged in or facilitated a scheme to conceal the fact that securities were sold by an agent without an active securities license;

(iv)    Whether Defendants, or any of them, engaged in or facilitated a scheme to defraud and/or breach any legal duties owed to Class Members.

### Typicality: Fed. R. Civ. P. 23(a)(3)

17.    Plaintiffs' claims are typical of the claims of other members of the Class because, among other things, all such members were similarly situated and were comparably injured through Defendants' wrongful conduct as set forth herein.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

18.    Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of other members of the Class. Plaintiffs have retained competent counsel with complex-litigation experience, and Plaintiffs intend to vigorously prosecute the Class Action. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

### Superiority: Fed. R. Civ. P. 23(b)(3)

19.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

20.    Even if members of the Class could afford individual litigation, the Court system likely could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device

presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

## Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)

21.     To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

## General Class Allegations

22.     Community Bank permitted Dave Rowe—a felon convicted of wire fraud—to open over a dozen accounts for Integrated Medical.

23.     Had Community Bank conducted even basic diligence on Rowe, it would have determined he had orchestrated a high-profile fraud scheme. *See, e.g.*, *United States of America v. David Frank Rowe*, Case No. CR 01-20059 JW (U.S.D.C. N.D. Cal.); *see also Frances R. Bean, et al. v. Cambridge Intl. Bank & Trust, Ltd., et al.*, Case No. 01-0365-MJ-S (S.D. Ala 2001). It would have determined Rowe had been convicted of wire fraud in the Northern District of California. It would have determined Rowe had recently been released from the supervision of the Federal Bureau of Prisons after serving a sentence for wire fraud. It would have determined that he petitioned for bankruptcy protection in 2002 to avoid liability to and to stiff the U.S. citizens he defrauded. It would have determined that the bankruptcy court entered default judgment against him for his fraud in the amount of $28,000,000 in compensatory damages and $25,000,000 in interest damages. And it would have determined that he sought bankruptcy protection for a second time in 2010 but was denied because he did not file his financial schedules and statements.

24.     Had Community Bank conducted even basic diligence on Rowe, it would not have permitted him to open over a dozen accounts for Integrated Medical.

25.     Community Bank did not conduct any diligence on Rowe and knowingly failed to follow established Know Your Customer ("KYC") protocols.

26.     Community Bank is required to follow KYC protocols.

27.     KYC protocols are mandated by long established regulator guidance as promulgated by federal statute and regulations.

28.     Community Bank willfully ignored or recklessly disregarded numerous other red flags arising from Rowe's conduct and the dozens of accounts he maintained at Community Bank for Integrated Medical.

29.     Integrated Medical was, ostensibly, a walk-in medical clinic, and Community Bank knew this. But Community Bank conducted no diligence on Integrated Medical, either.

30.     Yet Rowe deposited hundreds (or more) of checks from Class Members that clearly indicated the checks were investments. Many checks contained a notation of "investment," "private lender" or similar words, in the memo lines of the checks, and all the checks were payable in amounts beyond the threshold to trigger anti-money laundering warnings, all of which should have raised red flags within Community Bank.

31.     Rowe, in turn, instructed Community Bank to set up ACH payments—from other accounts he controlled—to make monthly payments back to the Class Members. The frequency and nature of these transactions—money in, money out—was an obvious hallmark of a classic Ponzi scheme. Community Bank turned a blind eye, and so long as Community Bank continued to intentionally look the other way, Rowe, Wadman, and Chancellor profited, and the Class Members lost.

32.     Eventually, more than 100 Class Members lost at least $9,000,000—the bulk of it through Community Bank—when the scheme imploded.

- 8 -

33.    Community Bank knew it owed duties to the Class Members, whose money was funneled into and out of Community Bank's accounts.

34.    In or about 2018, the Madison Timber Ponzi Scheme—the largest known Ponzi scheme in Mississippi history—became headline and household news in Central Mississippi after approximately $100,000,000 in investor money was stolen. Multiple banks were involved, and they were later sued for negligence, aiding-and-abetting torts, and conspiracy to commit fraud.

35.    In ruling on the banks' motions to dismiss, this Court held, with respect to negligence claims, that: "[b]anks have a duty to use ordinary care," which includes observing "reasonable commercial standards, prevailing in the area in which the [bank] is located, with respect to the business in which the [bank] is engaged." *See Mills v. Trustmark Nat. Bank*, 2021 WL 785328, *8 (S.D. Miss. Mar. 1, 2020).

36.    This Court held, with respect to conspiracy-to-defraud claims, that: "the overt act need not be *the bank's* for the bank to be liable" because "[c]ivil conspiracy exists as a cause of action to hold nonacting parties responsible." *Id.*, *5 (emphasis in original). This Court further held that, assuming the banks must have actual knowledge to be liable for conspiracy, the plaintiff alleged the banks "could see all the indicia of fraud…yet chose to enable and sustain the fraud. That meets Mississippi's definition of 'actual knowledge.'" *Id.* *5.

37.    Similarly, this Court held that a bank may be liable for aiding-and-abetting a breach of a fiduciary duty when it knows or should know of a fiduciary relationship and knows or should know (including through willful blindness or reckless disregard) that it substantially assisted a breach of fiduciary duties. *Id.* *6.

38.    To the extent any doubt existed in March 2021 about a Mississippi bank's duties owed to investors defrauded in Ponzi schemes, that doubt was removed by the decision cited above.

39.    Community Bank knew of the *Mills* case and monitored developments in that case.

40.    Yet within months of the *Mills* decision cited above, Community Bank willfully blinded itself to and recklessly disregarded the *exact* sort of conduct litigated in *Mills*.

41.    Even worse, Community Bank permitted a convicted wire-fraud felon to open dozens of accounts, ostensibly for a specious medical clinic, deposit hundreds of checks from over 100 distinct investors into those accounts, and direct ACH payments from other accounts back to those same investors. Stated otherwise, Community Bank intentionally ignored red flags, failed to conduct any sort of monitoring, and buried its head in the sand while over 100 Mississippians were defrauded of more than $9,000,000.

42.    There is no dispute that Class Members were defrauded of at least $9,000,000.

43.    Danny Chancellor sold investments in Integrated Medical to the Class Members. These investments were unregistered securities, and Chancellor did not have a securities license.

44.    Chancellor, in turn, provided Rowe with the Class Members' checks. Rowe deposited those checks into one of the many accounts he operated for Integrated Medical at Community Bank.

45.    The Mississippi Secretary of State's Office has already determined Chancellor's actions "cost Mississippi investors [*i.e.*, Class Members] nearly nine million dollars ($9,000,000) in addition to the emotional distress and added financial hardships incurred in trying to recover the money owed." *See* Cease and Desist Order, Office of Miss. Sec'y of State, Securities Div., Admin. Order No. S-24-7090 (Jun. 18, 2025), attached as **Exhibit 1**. The Class Members have not recovered their losses, compensatory or otherwise

46.    Chancellor's and Rowe's illegal conduct could never have occurred—and the Class Members would not have been harmed—had Community Bank not looked the other way, just as the receiver successfully alleged in the *Mills* case.

## Class Representative Allegations

### A.    David F. Rowe

47.    In 2020, Rowe, ostensibly a successful businessman, along with Wadman, allegedly owned and operated four walk-in medical clinics, located in Ridgeland and Biloxi, Mississippi, and Ft. Myers, Florida. These clinics, which Rowe had named Integrated Medical and Wellness Clinics, supposedly offered outpatient, non-surgical treatments, such as hormone therapy and intravenous infusion therapy, which Rowe and Wadman referred to as regenerative medicine and individualized treatments. Just the opposite of a successful businessman, however, Rowe had quite a checkered past.

48.    In the late 1990s, Rowe perpetrated an offshore bank fraud that bilked millions of dollars from unsuspecting United States and Canadian investors. Rowe, along with two other co-conspirators, established the Cambridge International Bank & Trust Co. ("CIBT"), which was licensed through the Caribbean nation of Grenada.[1]

49.    Upon information and belief, Rowe, who originally hails from England, was a resident of British Columbia, Canada, during the 1990s and, under the guise of trying to raise money to capitalize CIBT, he and his co-conspirators promoted investments in CIBT to investors in British Columbia and the United States. Rowe's pitch to investors was simple: in exchange for large, upfront investments structured as loans to CIBT, typically $500,000 or more, CIBT would promise a high return of interest (as high as 100%) for a six-month term on the investment. As additional assurance, Rowe represented that full insurance on each investment was underwritten through the Lloyd's of

---

[1]    In the late 1990s, Grenada became a haven for criminal banking activity when it began licensing offshore banks. These "banks" catered to individuals and depositors from around the world who were interested in sheltering their assets from taxation or oversight and investigation by their home governments and law enforcement agencies. In what became a notorious banking scandal that saw the creation and collapse of some 40 offshore banks licensed in Grenada, most of which were created for nefarious and illegal purposes, the Government of Grenada suffered severe reputational damage for essentially fostering and encouraging global banking fraud and money laundering.

https://www.csmonitor.com/World/Americas/2008/0531/p12s01-woam.html

London insurance market. In exchange for the investments, CIBT would offer each investor a promissory note with the terms of repayment. By December 2001, almost four years after he began his fraud, Rowe and his co-conspirators had collected approximately $28 million in investor money.

50.     Rowe and his co-conspirators had no intention of capitalizing CIBT and instead, they siphoned off the investors' money for their own personal uses. The scheme unraveled when 30 investors complained to the Federal Bureau of Investigation ("FBI") that they had not received the returns they had been promised on their investments. The FBI investigated, along with the British Columbia Securities Commission, and several of the British Columbia investors filed a multi-million-dollar lawsuit against Rowe and his co-conspirators.

51.     In March 2001, Rowe and his co-conspirators were arrested on charges of wire fraud resulting from the CIBT bank fraud. Their indictments were filed in the United States District Court for the Northern District of California, San Jose Division. *See United States of America v. David Frank Rowe*, Case No. CR 01-20059 JW. At the time of his arrest, Rowe was living in Alabama, and he was extradited back to California.

52.     In May 2021, sixteen of the bilked CIBT investors filed suit against Rowe and his co-conspirators in the United States District Court for the Southern District of Alabama. *See Frances R. Bean, et al. v. Cambridge Intl. Bank & Trust, Ltd., et al.*, Case No. 01-0365-MJ-S (S.D. Ala 2001). In January 2002, Rowe filed for bankruptcy protection in the United States District Court for the Southern District of Mississippi, seeking to avoid financial responsibility for his wrongful actions. *See David F. Rowe*, Case No. 02-00556-ee (Bankr. S.D. Miss. 2002). He claimed $33,000,000 in debts, most of which stemmed from a breach of contract action brought by CIBT.

53.     In May 2002, CIBT brought an adversary proceeding against Rowe in his bankruptcy proceeding. *See Cambridge Intl. Bank & Trust Co., Ltd. v. Rowe*, Case. No. 02-00076-ee (Bankr. S.D. Miss. 2002). CIBT brought the action for the benefit of the bilked investors, seeking to claw back investment

funds that Rowe had stolen for his own personal use. In July 2003, the bankruptcy court entered default judgment against Rowe in the amount of $28,000,000 in compensatory damages and $25,000,000 in interest damages finding:

> The indebtedness owed by Defendant to Cambridge Bank should be and hereby are excepted from discharge pur[suant] to 11 USC 523[a]2[A]. In addition debt owed by the Defendant to Cambridge Bank should be and hereby are excepted from discharge and determined to be nondischargeable pursuant to 11 USC 523[a]2[B] in that **it represents a debt for money obtained by the usages of statements in writing that were materially false respecting the defendant's or insider's financial condition on which investors in Cambridge Bank reasonable (sic) relied and that there were statements in writing that the defendant caused to be made or published with interest (sic) to deceive. The actions of the Defendant as detailed in the Complaint constitute fraud or defalcation while the Defendant was acting in a fiduciary capacity to Cambridge Bank.** As a result the debts owed by the Defendant to the Plaintiff should be and hereby are excepted from discharge and determined to be nondischargeable pur[suant] to 11 USC 523[a]4. **Defendant's actions in taking property from Cambridge Bank reflect actions that were malicious and willful and that caused injury to Cambridge Bank as a result of the malicious injuries** by the Defendant to the property of Cambridge Bank the debt owed by the Defendant to Cambridge Bank should be excepted from discharge and determined to be nondischargeable pur[suant] to 11 USC 523[a]6.

*See David F. Rowe*, Case No. 02-00556-ee, Dkt. 58 (Bankr. S.D. Miss. 2002) (emphasis added).

54.     In December 2007, six years after his arrest, Rowe pleaded guilty to wire fraud. In 2010, Rowe for a second time sought bankruptcy protection, this time for Chapter 13 relief. *See David Frank Rowe*, Case No. 10-01968-ee (Bankr. S.D. Miss. 2010). Rowe claimed he had assets between $0 and $50,000, and liabilities of $100,001 to $500,000. Ultimately, Rowe's petition was denied because he failed to file his financial schedules and statements. In 2012, he was summoned back to federal court in California for failing to pay restitution, one of the conditions of his supervised release. In response, Rowe claimed he was indigent and living in Houston, Texas, unable to afford the travel

expenses to return to California to appear at his initial appearance. In July 2013, Rowe formally completed his sentence.[2]

**B.     Integrated Medical**

55.     In June 2019, six years after the completion of his sentence, Rowe formed Integrated Medical and Wellness Clinic of Mississippi, LLC ("Integrated Medical"), a Mississippi-registered limited liability company and partnered with Wadman. The ostensible purpose of this company was to build and operate the walk-in, regenerative medical clinics envisoned by Rowe and Wadman. By this time, Rowe was projecting the appearance of a successful businessman.[3] Exactly how, or even if, he had actually achieved financial success since his bankruptcy filings, $53,000,000 default judgment and felony conviction is not clear – filings with the Mississippi Secretary of State's Office indicate that Rowe maintained interests in at least six (6) limited liability companies, several of these with Wadman; however, a cursory examination of these companies reveals that most are either dissolved, or show no obvious business operations or sources of income.

56.     Between late 2020 and early 2021, Rowe and Wadman met with Danny Chancellor in Mississippi and began discussions about combining their efforts, skill and knowledge in what would become a joint venture to defraud investors. Chancellor, whose securities license and registration were terminated in 2017, was no stranger to unlawful investment activities. He had been sanctioned and had his securities license suspended multiple times for conduct including forging a client's signature on a policy delivery receipt, failing to communicate with the client, executing an unauthorized

---

[2]     It is unknown at this time whether Rowe was returned to prison for violating the terms of his supervised released or if he was allowed to remain on supervised release; however, the Federal Bureau of Prisons record reflects that Rowe was released from custody on July 5, 2013. *See* Federal Bureau of Prisons Inmate Locator: https://www.bop.gov/inmateloc//index.jsp

[3]     Rowe divided his time between Texas, Mississippi, Alabama and Florida, traveling back and forth between these states.

transaction on behalf of a client, making materially misleading statements, failing to disclose a tax lien on his U-4 disclosure form, selling unsuitable investments, charging excessive fees and commissions, and regulatory sanctions. *See* In re Chancellor, No. 2-11-0259 (Miss. Sec'y. of State Sept. 18, 2012) (Administrative Consent Agreement); *see also* Dept. of Enf. v. Chancellor, No. 2014040750201 (FINRA Dec. 15, 2016) (Order Accepting Offer of Settlement); *and see* In re Chancellor, No. LS-17-2291 (Miss. Sec'y. of State June 21, 2017) (Administrative Consent Order).

57.    Under the pretense of a legitimate investment, Rowe, Wadman, and Chancellor prepared a promotion and pitch where they would tell investors they were raising money as capital to fund the expansion of Integrated Medical clinics in Mississippi and Texas. To entice investors, they would offer investments in Integrated Medical, and in return, Integrated Medical would give each investor a promissory note guaranteeing an annual return of either 10.5% or 13.3% for a term of either two (2) or four (4) years. The interest on each investment would be paid in monthly installments.

58.    Utilizing promissory notes to complete their scheme was a natural choice for Rowe and Chancellor, as both men had extensive experience with those instruments. Fraudulent and worthless promissory notes with promises of extraordinarily high interest returns were the foundation of Rowe's CIBT offshore fraud, while Chancellor had spent the past three years trying to skirt his securities license suspensions by selling promissory notes via a straw agent.

59.    In May 2021, Integrated Medical began issuing promissory notes to investors. The scheme was fraudulent from the outset. Neither Rowe nor Wadman had ever registered as a securities professional with the Mississippi Secretary of State, nor had Integrated Medical ever registered or notice-filed any securities offerings. Moreover, Chancellor was unlicensed, and his registration status was listed as terminated. Undeterred, Chancellor sold investments in Integrated Medical, relying on his previous experience in the securities industry, as well as his personal relationships with potential investors, promising them lucrative returns. Chancellor never disclosed to investors that neither he,

nor the investment opportunity, were not registered. Instead, Chancellor held himself out as a broker for Integrated Medical and gave the impression to investors that he was still a registered professional in the investment industry.

60.    Chancellor solicited investors to invest in Integrated Medical, many of whom had prior connections to Chancellor, and thought he was still their financial advisor. Chancellor communicated with these investors, conducted deals and serviced the investments under the letterhead and banner of Malachi Financial, the firm name he used when he was licensed to sell securities, giving the investors the justifiable impression that he was still a registered professional in the securities industry.

61.    On or about December 8, 2021, Chancellor met with Terry and Barbara Mood in Oxford, Mississippi, to promote and recommend they invest in Integrated Medical. Chancellor initially represented that he was working on behalf of a large venture that was looking for investors to help expand its business. The Moods had been long-time clients and friends of Chancellor, yet they had no idea Chancellor's securities licenses and registration had been suspended.

62.    In their December 8, 2021, meeting, Chancellor described this new investment opportunity as "Integrated Medical and Wellness Clinics of Mississippi," a medical venture founded by Rowe. Chancellor promoted Integrated Medical as a start-up company whose purpose was to offer medical services through outpatient clinics at various locations throughout Mississippi, reminiscent of the familiar for-profit medical clinics that have proliferated throughout the state over the last 25 years. According to Chancellor, Integrated Medical and Rowe were seeking investors to raise money for a planned buildout of the medical clinics. Also, according to Chancellor, Rowe was a friend of his who had asked Chancellor to assist with the capital raise needed to fund the expansion. Chancellor represented that Integrated Medical was offering investors the opportunity to invest in Integrated Medical, which would then give the Moods a promissory note guaranteeing a 13.3% annual return over four years, plus a full return of principal.

63.    In reliance on Chancellor's promotions and representations about the Integrated Medical investment, Mood and his wife, Barbara, agreed to invest $50,000.00 in an initial investment with Integrated Medical, which Chancellor represented would pay them interest payments of $554.17 per month for 48 months, plus a full return of principal. Chancellor instructed the Moods to write a personal check for the $50,000.00, and to give Chancellor a blank check marked "Cancelled" to be used by Community Bank for direct deposit of the monthly interest income payments. The Moods complied with these instructions and provided Chancellor with the checks.

64.    Following the Moods' agreement to invest in Integrated Medical, the Moods provided their bank account routing information to facilitate the interest payments that were to be ACH-deposited into their account from Integrated Medical's accounts at Community Bank.

65.    The Moods did not know, and Chancellor did not disclose that: (1) Rowe was a convicted felon who had been convicted of wire fraud in federal court for an offshore bank fraud perpetrated using bogus promissory notes; (2) Neither Rowe nor Wadman had ever registered as a securities professional with the Mississippi Secretary of State, nor had Integrated Medical ever registered or notice-filed any securities offerings; (3) Chancellor was unlicensed, and his securities registration status was terminated; and (4) Chancellor had multiple disciplinary actions that he incurred from federal and state regulatory agencies stemming from his securities law violations.

66.    Thereafter, Chancellor had possession of the Moods' check for $50,000.00 made payable to Integrated Medical. Chancellor gave this check to Rowe, who then endorsed it solely by signing his own name, without any reference to Integrated Medical. This check was then deposited into Rowe's accounts at Community Bank.

67.    In January 2022, the Moods began receiving monthly interest payments from Integrated Medical. These payments continued through the end of 2022, and Community Bank facilitated these interest payments through ACH.

68.    In February 2022, Chancellor approached Mood again, with the intention of pressing him to invest more money in Integrated Medical. Again, Chancellor met with the Moods in Oxford and recommended that they invest more money in Integrated Medical because it was a unique and lucrative opportunity. Mood and his wife, Barbara, agreed to make three additional investments totaling $110,000.00. Chancellor directed and arranged the investments on behalf of the Moods as follows:

a.    On February 18, 2022, Terry and Barbara Mood invested another $50,000.00 in exchange for a promissory note from Integrated Medical guaranteeing monthly interest payments of $554.17 for 48 months.

b.    On February 18, 2022, Barbara Mood invested $25,000.00 in exchange for a promissory note from Integrated Medical guaranteeing monthly interest payments of $277.08 for 48 months.

c.    On March 1, 2022, Barbara Mood's IRA (referenced as "Digital Trust FBO Barbara Mood IRA") invested $35,000.00 in exchange for a promissory note guaranteeing monthly interest payments of $387.92 for 48 months.

69.    Chancellor instructed the Moods to write personal checks for each individual investment, which they did, and as to the investment from the Barbara Mood IRA, Chancellor prepared the payment paperwork to authorize the IRA custodian to transfer the principal investment to Integrated Medical's bank account at Community Bank. The Moods reposed special trust in the investment because, among other things, the principal investment of the Barbara Mood IRA would be deposited with Community Bank.

70.    Chancellor also completed bogus Secured Capital Agreements for each investment wherein he set the terms of the security agreements backing each promissory note and also set up the ACH authorizations for the monthly interest deposits from Community Bank into the Moods'

checking accounts and the Barbara Mood IRA. The Moods complied with all of Chancellor's instructions and directions regarding each investment, all of which were funded with their qualified or non-qualified retirement savings.

71.     In total, the Moods received four (4) promissory notes.

72.     In October 2022, Barbara Mood passed away and Terry Mood inherited the contractual rights under the Integrated Medical promissory note to Barbara Mood, individually. Likewise, the Terence Byron Mood IRA assumed ownership of the Barbara Mood IRA as well as its contractual rights under the Integrated Medical promissory note to the Barabra Mood IRA.

73.     That same month, Mood executed a Durable and General Power of Attorney in which he appointed his daughter, Jeannie Campbell, to serve as his attorney-in-fact.

74.     Mood received monthly interest payments from Integrated Medical through March 2023 via ACH from Community Bank; however, that month, the monthly interest payments stopped without notice or explanation.

75.     In 2023, Chancellor sent Mood his 2022 year-end statements for the Integrated Medical investments.

76.     Mood repeatedly inquired about the delinquent interest payments, but neither Chancellor nor Rowe ever made any further payments.

**C.     Community Bank of Mississippi**

77.     Community Bank played an instrumental role in perpetrating, and profiting from, the fraudulent scheme to sell worthless, unregistered securities to over 100 vulnerable investors, including to the Moods.

78.     Community Bank looked the other way when Dave Rowe opened over a dozen, and possibly two dozen, accounts for Integrated Medical.

79.     Community Bank did not conduct any diligence on Dave Rowe when he opened his accounts. Nor did Community Bank conduct any diligence on Dave Rowe when millions of dollars flowed into, and out of, Integrated Medical's accounts. Had Community Bank conducted diligence, it would have discovered Dave Rowe had a federal conviction for wire fraud, a felony, stemming from a massive bank fraud scam. Had Community Bank conducted diligence, it would have discovered Dave Rowe had $53,000,000 of non-dischargeable debt following bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Mississippi.

80.     Community Bank intentionally, or with reckless disregard, violated its KYC obligations. So long as money flowed into Integrated Medical's accounts, Community Bank collected fees. All the while, it looked the other way.

81.     The number of accounts Dave Rowe set up for Integrated Medical should have raised Community Bank's suspicion and should have triggered an investigation. But Community Bank looked the other way.

82.     The volume of personal checks deposited into Integrated Medical's accounts at Community Bank—many bearing notations in the memo lines such as "investment," "private lender" or words to that effect and all of them in amounts beyond the threshold to trigger anti-money laundering warnings —should have raised Community Bank's suspicion and should have triggered an investigation. But Community Bank looked the other way.

83.     The frequency of activity on Integrated Medical's accounts—many hundreds of transactions that conspicuously had no plausible nexus to Integrated Medical's business—should have raised Community Bank's suspicion and should have triggered an investigation. But Community Bank looked the other way.

84.     The volume of money deposited into Integrated Medical's accounts, including the obvious 'new money in, old money out,' bore the hallmarks of a classic Ponzi scheme. These

transactions should have raised Community Bank's suspicion and should have triggered an investigation. But Community Bank looked the other way.

85.    Community Bank must comply with Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") regulations and protocols. BSA/AML regulations and protocols include, for example: conducting KYC diligence and monitoring; investigating and reporting suspicious activity; employ systems to monitor transactions for patterns indicating money laundering or illegal banking activity; filing currency transaction reports for cash transactions exceeding $10,000; filing suspicious activity reports if the bank suspects money laundering, fraud, or other illegal activity; developing customer risk profiles and monitoring activity to identify any departure from the established profile or other illegal activity; establishing internal controls, including redundant or dual controls, oversight, segregation of critical investigating, reporting, and filing duties; conducting risk assessments regarding illicit financial activity, taking into account business lines and activities; and implementing routine and recurring training on BSA/AML compliance obligations.

86.    Community Bank intentionally, or with reckless disregard, did not comply with the foregoing BSA/AML regulations and protocols. Community Bank's failure to comply with BSA/AML regulations and protocols was the but for cause of Plaintiffs' financial injuries, which were predictable and foreseeable.

### COUNT I
### Negligence, Gross Negligence, and Recklessness

87.    The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

88.    "Negligence is a failure to do what the reasonable person would do under the same circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

89.     While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

90.     Community Bank was in an advantageous position to discover the Ponzi scheme perpetrated by Rowe, Wadman and others. In view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered Rowe's fraud.

91.     Community Bank not only failed to exercise due care, it failed or refused to exercise any care at all in its dealings with Rowe.

92.     Community Bank's recklessness, or at a minimum negligence, allowed Rowe's fraud to grow to a $9,000,000 Ponzi scheme carried out over only a period of less than two years.

93.     But for Community Bank's recklessness, or at a minimum negligence, Rowe's Ponzi scheme would never have gotten off the ground and/or it would have been stopped before it ultimately failed and before Class Members lost their investments.

94.     Community Bank, by its recklessness or, at a minimum negligence, contributed to Rowe's and Wadman's illegal success over time. Community Bank's recklessness and/or negligence is a proximate cause of the Class Members' losses.

95.     Community Bank is liable to the Class Members for their losses, which Community Bank's recklessness or, at a minimum negligence, proximately caused.

96.     Because Community Bank acted with gross negligence evincing a reckless disregard of the wellbeing of others to whom it owed a duty of care, Community Bank is liable for punitive damages.

## COUNT II
## Aiding-and-Abetting Breach of Fiduciary Duty

97. The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

98. The Restatement (Second) of Torts § 876(b) (1979) provides that a defendant is liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another. *See Mills*, 2021 WL 785328, *6 – 7 (holding under Mississippi law, a bank may be liable for aiding-and-abetting a breach of fiduciary duty during a Ponzi scheme).

99. Community Bank aided and abetted Rowe and Wadman in committing breaches of duties owed by Rowe and Wadman to Class Members and in other tortious conduct alleged in this complaint. Community Bank further knew or should have known Rowe owed the Class Members a fiduciary duty, as he was the principal of Integrated Medical, accepted "investment" or "private lender" checks from Class Members, deposited those checks into Integrated Medical accounts, and caused Community Bank to execute ACH transfers to other Class Members from those same accounts.

100. In view of the numerous red flags described in this complaint, Community Bank knew or should have known that Integrated Medical was a Ponzi scheme orchestrated and managed by Rowe.

101. Numerous red flags notwithstanding, Community Bank gave substantial assistance and encouragement to Rowe and Wadman by, among other things, permitting Rowe to open more than a dozen accounts for Integrated Medical despite having a federal bank-fraud conviction, a felony; depositing hundreds of checks from Class Members into these accounts, some of which were

- 23 -

conspicuously labeled as "investment" (or words to the effect), in amounts exceeding $9,000,000; lending its name and credibility to Rowe to give the Class Members a false sense of security regarding the safety and propriety of their investments; and by facilitating and executing fraudulent "interest" payments via ACH transactions to other Class Members. Community Bank provided far more than "routine" banking services. *See Rotsain v. Trustmark Nat. Bank*, 2022 WL 179609, *9 – 10 (N.D. Tex. Jan. 20, 2022) (denying bank's motion for summary judgment and finding evidence of "substantial assistance" that included more than "routine" services).

102.    Community Bank was essential to the operating of the Integrated Medical Ponzi scheme. But for Community Bank's substantial assistance and encouragement, Rowe's Ponzi scheme would have been impossible, and the Class Members would not have been injured.

103.    Community Bank contributed to Rowe's success over time, which compounded the losses suffered by the Class Members.

104.    Community Bank is jointly and severally liable for the wrongful acts committed by Rowe, which its substantial assistance and encouragement proximately caused.

105.    Because Community Bank acted with reckless disregard for the wellbeing of others, and in specific instances described in this complaint acted willfully and intentionally, punitive damages are appropriate.

## COUNT III
## Conspiracy to Commit Fraud

106.    The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

107.    Mississippi law defines a civil conspiracy as a "combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).

108.    For purposes of 'intent' or '*mens rea*' in the context of a civil conspiracy, a defendant has "actual knowledge" if it "see[s] all the indicia of fraud" but chooses to do nothing but tacitly or passively participate in the wrongdoing anyway. *See Mills*, 2020 WL 785328, *5. The agreed purpose of the conspiracy may be "tacit," and the "overt act" need not be committed by the defendant for it to be liable. *Id.* This is because "[c]ivil conspiracy exists as a cause of action to hold nonacting parties responsible." *Id.* (citation and quotation omitted).

109.    Community Bank conspired with Rowe and Wadman to commit the tortious acts alleged in this complaint.

110.    Community Bank agreed to assist Rowe by permitting him to open more than a dozen accounts at Community Bank, despite his federal bank-fraud conviction, a felony, without any scrutiny, diligence, or oversight; to operate a Ponzi scheme through the use of accounts held at Community Bank; to operate automatic banking services, including ACH transactions, to facilitate the flow of money out of Community Bank's accounts; to allow Rowe to use the "Community Bank" name with the Class Members, which gave them a false sense of security about the safety and propriety of their investments; and in other ways to be shown at trial.

111.    Rowe and Wadman were acting unlawfully. Besides stealing the Class Members' money through their Ponzi scheme, they had no securities license to sell or assist in the selling of securities – and Community Bank either knew this or should have known this.

112.    In furtherance of the conspiracy, among other overt acts: Chancellor solicited Class Members to invest in Integrated Medical, even though it was an unregistered security and he had no securities license; Rowe accepted investments from Class Members, and deposited those investments into accounts at Community Bank; and, before the Ponzi scheme imploded, Rowe caused Community Bank to transfer funds via ACH out of some accounts to some Class Members (*i.e.*, new money in, old money out).

113.    Community Bank need not have known that Rowe and Wadman were operating a Ponzi scheme to unlawfully conspire with them. Nevertheless, in view of the numerous red flags described in this complaint, Community Bank knew or should have known that Rowe and Wadman were operating a Ponzi scheme.

114.    Numerous red flags notwithstanding, Community Bank lent its influence, its professional expertise, and its banking platforms and services to Rowe to operate its Ponzi scheme. Community Bank was essential to Rowe's and Wadman's operation of the Ponzi scheme. But for Community Bank's actions, inactions, influence, and capabilities, Rowe and Wadman would not have been able to carry out their Ponzi scheme.

115.    Community Bank's facilitation of and participation in the Ponzi scheme was the proximate cause of the Class Members' losses and financial injuries.

116.    Because Community Bank acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed, participated in, and/or facilitated actual fraud, punitive damages.

## COUNT IV
## Breach of Fiduciary Duty

117.    The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

118.    Rowe and Wadman owed the Plaintiffs a fiduciary duty because they accepted their money as an investment with a promised rate of return, and the Plaintiffs justifiably reposed trust in him.

119.    Rowe and Wadman breached their fiduciary duty by investing the Plaintiffs' money in a Ponzi scheme, an illegitimate investment, and by pilfering the Plaintiffs for their own purposes, including by using the money for a purpose other than which the Plaintiffs intended for it to be used.

120.    Rowe's and Wadman's breach of their fiduciary duty is a proximate cause of the Plaintiffs' damages. But for Rowe's and Wadman's breach of duty, the Plaintiffs would not have suffered damages.

121.    Because Rowe and Wadman acted willfully and maliciously, the Plaintiffs are entitled to an award of punitive damages and attorneys' fees.

**COUNT V**
**Fraud**

122.    The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

123.    Rowe and Wadman never intended to invest the Plaintiffs' money in a legitimate investment, and they never intended to pay the Plaintiffs the returns they were promised.

124.    Instead, Rowe and Wadman used Chancellor to market and sell unregistered securities without a securities license. Rowe and Wadman used Chancellor and his firm's trade name, Malachi Financial Agency, LLC, to give victims a reasonable—but false—sense of security. To be sure, the use of the trade name "Malachi Financial" was an obvious affinity fraud – one aimed at exploiting a victim's religious belief to make the investment seem trustworthy and sound.

125.    Rowe and Wadman also used Community Bank to give victims a reasonable—but false—sense of security. Rowe and Wadman intended for their victims to lend extra credence to the propriety of the investments because their money would flow into, and out of, Community Bank, which is a well-known bank in Mississippi.

126.    Chancellor and Community Bank were essential instruments of Rowe's and Wadman's fraud, and without either, Rowe and Wadman would not have been able to perpetrate their fraud or, in the alternative, Rowe and Wadman would not have been able to perpetrate their fraud for as long or as extensively.

127.    Rowe was an experienced fraudster. He was a convicted felon, and he had defrauded investors in a similar fraud scheme in the early 2000s for $28,000,000. Rowe knew how to orchestrate and run a fraud scheme, and he used his earlier experience operating a fraud scheme out of a bank in the island nation of Grenada to operate a fraud scheme out of a bank in Mississippi.

128.    Through the fraud scheme that is the subject of this complaint, Rowe and Wadman defrauded their victims out of at least $9,000,000. Rowe's and Wadman's fraud, and Chancellor's and Community Bank's participation in that fraud, is the proximate cause of the Plaintiffs' damages.

129.    Because this fraud was operated willfully and maliciously, the Plaintiffs are entitled to recover punitive damages and attorneys' fees.

## COUNT VI
### Punitive Damages and Attorney's Fees

130.    The Plaintiffs incorporate and re-allege the foregoing allegations as if fully set forth herein.

131.    The Plaintiffs are entitled to punitive damages because Defendants acted intentionally, willfully, and/or in reckless disregard for the Plaintiffs.

132.    Incident to an award of punitive damages, the Plaintiffs are also entitled to an award of attorney's fees.

## DAMAGES

133.    As to all the above claims, and as a proximate cause of Defendants' wrongful conduct, the Plaintiffs have suffered economic losses and other damages.  As to all the above claims, the Plaintiffs request all actual, compensatory, and statutory damages available.

134.    The acts, omissions, and other conduct of Defendants alleged herein were deliberate, willful, wanton and malicious and/or were reckless and were made with complete disregard for the welfare of the Plaintiffs. Under these circumstances, Defendants' conduct was so outrageous as to

shock the public conscience. In that the wrongful acts of Defendants were characterized by such outrageous conduct, aggravation, willfulness, wantonness, malice, gross negligence, recklessness, oppression, insult, or gross fraud as alleged herein, the Plaintiffs are entitled to recover punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from committing the same wrongful acts. Plaintiffs request punitive damages as to all claims herein above.

**WHEREFORE, on behalf of themselves and the Class Members, the Plaintiffs request**:

a.    actual compensatory damages, in the amount of at least $9,000,000;

b.    non-economic compensatory damages, in amounts to be determined by a jury;

b.    reasonable attorneys' fees;

c.    pre-award and post-award interest;

d.    punitive damages of at least nine times the compensatory award, in the amount of at least $81,000,000; and

e.    such other and further relief as is available and deemed just and proper under the circumstances.

This the 8th day of October 2025.

Respectfully submitted:

**Terence Byron Mood**
**Terence Byron Mood IRA**


*/s/ Judson M. Lee*
Judson M. Lee (MB# 100701)
*One of their attorneys*

- 29 -

Of Counsel:

**JUDSON M. LEE, PLLC**
2088 Main Street, Suite A
Madison, MS 39110
T. 601.707.9711
F. 601.707.7509
jlee@ms-lawyer.net

**HEIDELBERG PATTERSON WELCH WRIGHT**
Chadwick M. Welch (MB# 105588)
368 Highland Colony Parkway
Ridgeland, MS 39157
T. 601.790-1588
F. 601.707.3075
cwelch@hpwlawgroup.com